IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Amanda Lane Wheeler, | ) | |
| Plaintiff, | ) | Civil Action No. 6:09-3344-KFM |
| | ) | |
| vs. | ) | **O R D E R** |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

This case is before the court for a final order pursuant to Local Rule 73 and Title 28, United States Code, Section 636(c).  The case was referred to this court for disposition by order of the Honorable Henry F. Floyd, United States District Judge, filed January 7, 2010.

The plaintiff, who was represented by counsel at the time she filed her complaint but is now proceeding *pro se*, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed her application for supplemental security income (SSI) benefits on March 29, 2006, alleging a disability onset date of November 23, 2004.  The application was denied initially and on reconsideration by the Social Security Administration.  On October 10, 2006, the plaintiff requested a hearing.  The administrative law judge,

before whom the plaintiff, her attorney, and a vocational expert appeared on December 30, 2008, considered the case *de novo*, and on February 23, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 21, 2009.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant has not engaged in substantial gainful activity since March 29, 2006, the application date (20 C.F.R. § 416.971 *et seq*.).
>
> (2)    The claimant has the following severe impairment: Bipolar and Personality related disorders (20 C.F.R. § 416.921 *et seq*.).
>
> (3)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926).
>
> (4)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple one or two step tasks and instructions in jobs with no more than occasional public contact.
>
> (5)    The claimant has no past relevant work (20 C.F.R. § 416.965).
>
> (6)    The claimant was born on July 25, 1984 and was 21 years old, which is defined as a younger individual, on the date the application was filed (20 C.F.R. § 416.963).
>
> (7)    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).
>
> (8)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

2

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969a).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since March 29, 2006, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled

3

at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct

4

> a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The record reveals the plaintiff applied for SSI in March 2006, alleging an inability to work beginning November 23, 2004, due to attention deficit hyperactivity disorder ("ADHD"), depression, anxiety, attention deficit disorder, and bipolar disorder (Tr. 79, 129). Born on July 25, 1984, the plaintiff was 20 years of age on the date she alleges she became disabled and was 24 years of age on the date of the ALJ's decision (Tr. 76, 79). The plaintiff worked in the past as a server/cashier in a fast food restaurant between 2001 and 2005 (Tr. 30), but she never earned enough money from this work activity for it to rise to the level of past relevant work (Tr. 90-91).

During her teenage years, the plaintiff received treatment for ADHD, as well as her issues with socializing with others and poor judgment (Tr. 180-98). On April 16, 2002, three months before her 18th birthday, the plaintiff discontinued treatment because she decided she did not need therapy. The plaintiff had achieved her goals of staying in school and getting a job. She had been on Adderal (for ADHD) and Paxil (for depression and anxiety), but was discharged without any medications (Tr. 184).

The plaintiff received routine medical treatment from Dr. Louis Browne for upper respiratory infections, strep throat, coughs, sinus congestion, and headache (Tr. 200-

5

04).  On June 25, 2004, she presented to Dr. Browne requesting medication for ADHD. She also thought she had bipolar disorder because she had mood swings and anger issues.  The plaintiff said she was going to see behavioral health in about four to six weeks. Dr. Browne indicated it was questionable whether the plaintiff had bipolar disorder, but noted that the plaintiff had a past diagnosis of depression and ADHD.  He provided her with a 30-day prescription for Risperdal and Adderal (Tr. 200).

On January 6, 2005, Roger Ginn, Ph.D., performed a psychological consultative examination of the plaintiff in connection with her first application for benefits (Tr. 207-09).  The plaintiff reported she lived with her boyfriend and was working three days a week at McDonald's. She denied having any difficulties with that job.  She was trying to get a job in a local auto parts store.  The plaintiff complained she had difficulty keeping jobs because her ADHD caused her to snap at people.  The plaintiff was pleasant, friendly, and cooperative.  Her speech was clear and logical, and there were no signs of a thought disorder or delusional thinking.  The plaintiff stated she was in good health and denied having any problems with anxiety or depression.  During her time off work, she watched television, played video games, and spent time with her boyfriend.  Her long-term plan was to get married and have children (Tr. 207-08).

The plaintiff did not have any difficulty understanding or following directions during testing.  Dr. Ginn thought that her test scores were valid. She attained a Verbal IQ of 75, a Performance IQ of 98, and a Full Scale IQ of 84.  Dr. Ginn found the plaintiff's ability to use language for abstract thinking was fair.  Her social reasoning and judgment and arithmetic skills were weaknesses.  Dr. Ginn found the plaintiff could remember simple to moderate level job-related tasks and that her area of strength was her hands-on skills. Dr. Ginn stated the plaintiff could deal with work-related stress and would do better in jobs that were more hands-on oriented and with less contact with people.  Dr. Ginn observed the plaintiff appeared to be "functioning quite adequately" (Tr. 208-09).

On January 24, 2005, Lester Frederick Lewis, Ph.D., a State agency physician, reviewed the plaintiff's medical record and determined she had no medically determinable mental impairment (Tr. 210).

On March 31, 2006, Dr. Eric S. McGill evaluated the plaintiff for bilateral lower abdominal pain. Dr. McGill scheduled diagnostic testing and prescribed medications (Tr. 363-64).

On May 2, 2006, Dr. McGill stated the plaintiff's colonoscopy was normal and he thought her pain was from irritable bowel syndrome. He instructed the plaintiff to continue her medications and keep a food diary (Tr. 362). In a letter dated May 11, 2006, Dr. McGill stated that he had been treating the plaintiff for lower abdominal pain, which he attributed to irritable bowel syndrome. All diagnostic testing had been unremarkable. Dr. McGill noted the plaintiff seemed to be improving on medication (Tr. 241).

On May 10, 2005, when the plaintiff returned to Dr. Browne for the first time since her June 2004 visit, her only complaint was a sore throat (Tr. 230). Dr. Browne treated the plaintiff in December 2005 for a sore throat and in February 2006 for symptoms of a urinary tract infection (Tr. 229).

On May 18, 2006, Karl R. Bodtorf, Psy.D., performed a psychological consultative examination of the plaintiff. The plaintiff stated that she was diagnosed with ADHD at the age of seven or eight and used several medications through the years. The plaintiff described being easily irritated and frustrated. She noted she had not received any mental health treatment since her late teen years. The plaintiff said she had difficulty concentrating without her medication (Tr. 257). She was fully oriented and could repeat a sentence provided orally. She could obey a written command, write a sentence, and copy a geometric figure. The plaintiff had normal speech, motor skills, attitude, and motivation (Tr. 256). She stated she had irritable bowel syndrome and had some difficulties with migraine headaches. She reported she was frequently in trouble as a child. She quit high

7

school but took and passed the GED in March 2006.  The plaintiff said she last worked at McDonald's in January 2005, when she and her boyfriend were living in Maine.  The plaintiff noted she lived with her parents, and she reported interpersonal difficulties with her father.  The plaintiff acknowledged she could take care of her basic needs.  She spent time being on the computer and playing video and internet games.  She said she helped her mother with housework and went with her family to the grocery store (Tr. 258).  She stated she had difficulty getting along with others who picked on her.  The plaintiff reported she frequently went out with her mother (Tr. 259).

Dr. Bodtorf noted the plaintiff presented with a dysphoric quality with respect to her mood and her affect seemed flat.  The plaintiff was cooperative, although somewhat reserved in her interactions with Dr. Bodtorf.  He believed she had moderate limitations with respect to independent functioning; mild to moderate limitations with respect to memory/ concentration, and moderate limitations with respect to social functioning (Tr. 259).  Dr. Bodtorf diagnosed dysthymic disorder and ADHD (Tr. 260).

On June 2, 2006, Debra C. Price, Ph.D., a State agency physician, reviewed the plaintiff's record and determined that she had organic mental disorders, affective disorders, and personality disorders, which resulted in moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 261-71).  Dr. Price completed a mental residual functional capacity assessment in which she indicated the plaintiff was not significantly limited in most areas but was moderately limited in her ability to understand, remember, and carry out detailed instructions; interact appropriately with the general public; and set realistic goals or make plans independently of others (Tr. 275-76).  Dr. Price concluded the plaintiff was able to carry out simple tasks for two hours at a time without special supervision; relate appropriately to co-workers and

supervisors; and adapt to workplace changes and recognize and avoid normal hazards. The plaintiff would be best suited for a work setting with limited public contact (Tr. 277).

On August 21, 2006, Robbie Ronin, Ph.D., another State agency psychologist, reviewed the plaintiff's record and concurred with Dr. Price's June 2006 opinion (Tr. 285-300). Dr. Ronin opined the plaintiff could understand, remember, and follow simple instructions; maintain attention and concentration for extended periods; ask simple questions; accept instructions and respond appropriately to criticism; interact appropriately with supervisors and co-workers; travel to unfamiliar places; and adapt to the basic demands of a work environment. Dr. Ronin thought the plaintiff was not well suited for meeting the demands of working with the general public (Tr. 301).

On September 5, 2006, Donald Salmon, Ph.D., performed a consultative psychological examination of the plaintiff in connection with her application for benefits (Tr. 306-11). The plaintiff reported that she started having temper tantrums when she was six or seven and was diagnosed with ADHD. She described having behavioral problems as a child and said she took medication until she was 17. The plaintiff noted she was later diagnosed with bipolar disorder and had experienced trouble keeping jobs. The plaintiff presented with an angry demeanor and irritated mood and generally guarded and suspicious. She had normal speech and was fully oriented. She often seemed confused by questions and at times had to be redirected. The plaintiff stated she had transient auditory and visual hallucinations involving her deceased grandmother over the previous two years (Tr. 306). The plaintiff lived with her parents and reported her relationship with family members was volatile. She reported having few friends as a child and indicated she frequently fought with her peers and was picked on. She was arrested for assault at the age of 14. The plaintiff dropped out of school but finally obtained a GED after failing the test several times (Tr. 307).

9

The plaintiff complained of having frequent pain in her lower abdomen, right knee pain, and low back stiffness. She was not taking any medications (Tr. 308). Personality testing revealed the plaintiff often appeared to others as being somewhat odd or peculiar. She was generally resentful of people in authority, was highly impulsive, and had very poor judgment. The plaintiff had limited frustration tolerance, was immature, self-centered, egocentric. She often blamed others for her problems and had great difficulty taking responsibility for herself. She had feelings of insecurity and tended to be socially withdrawn and isolated (Tr. 309). The plaintiff was stubbornly oppositional when Dr. Salmon directed cognitive testing with serial seven subtractions. She did not have difficulty recalling four out of four words and was able to repeat five digits forward and three backward. The plaintiff did not appear to have significant difficulty with simple short-term memory tasks, but had tremendous difficulty with concentration (Tr. 310).

The plaintiff stated she spent her days watching television and playing with her pets. She could prepare some meals, clean her room, help her mother with yard work and housework, and shop. The plaintiff used the internet and enjoyed swimming and watching wrestling. Dr. Salmon diagnosed ADHD, bipolar disorder, and personality disorder (Tr. 310). Dr. Salmon concluded the plaintiff did not have significant limitations with regard to daily activities and could drive, but had marked limitations with regard to social interaction, concentration, persistence and pace (Tr. 311). Dr. Salmon completed a form stating the plaintiff had moderate restriction in her ability to make judgments on simple work-related decisions and marked limitations in interacting appropriately with the public, supervisors and co-workers, as well as marked limitations in responding appropriately to work pressures and work changes (Tr. 312-13).

The plaintiff presented to Dr. Browne on March 13, 2007, for evaluation of a cough (Tr. 373).

10

On August 30, 2007, Dr. John M. Rinkliff admitted the plaintiff to the hospital for abdominal pain and bloody diarrhea. A CT scan showed a thickened colon with surrounding edema in her ascending colon consistent with colitis. After starting on medications, the plaintiff improved and stabilized. Dr. Rinkliff discharged the plaintiff on September 2, 2007, with no activity restrictions (Tr. 316).

Treatment notes from Dr. McGill dated September 11, 2007, state that the plaintiff was "doing extremely well, tolerating a regular diet" (Tr. 361). On November 20, 2007, the plaintiff was asymptomatic and doing well since her hospitalization for colitis (Tr. 356).

On January 15, 2008, Dr. McGill scheduled the plaintiff for a follow-up colonoscopy for her colitis. He observed the plaintiff appeared to be asymptomatic (Tr. 355).

On April 23, 2008, the plaintiff presented to Dr. Browne for complaints that her feet had been swollen after working for 12 hours a day. On examination, the plaintiff had trace edema, but her circulation was good and her blood pressure was normal. Dr. Browne prescribed medications (Tr. 370). A note from Dr. Browne dated April 30, 2008, stated that the plaintiff was seen for edema secondary to walking 12 to 14 hours a day. Dr. Browne noted he advised the plaintiff to find a new job that did not require her to be on her feet all day (Tr. 314).

On December 22, 2008, Dr. Browne completed a medical source statement form stating that the plaintiff had marked limitations in understanding and remembering short simple instructions, making judgments or simple work or school related decisions, interacting appropriately with supervisors and coworkers, and interacting appropriately with the public. Dr. Browne further found the plaintiff had extreme limitations in understanding, remembering, and carrying out detailed instructions and responding appropriately to work pressures and work changes (Tr. 393-94).

11

On her disability report filed with her application for benefits, the plaintiff reported that she stopped working on January 31, 2005, because she moved back to South Carolina after she broke up with her boyfriend (Tr. 129). The plaintiff said she did not take any medications (Tr. 132). The plaintiff stated on her function report that she spent her days looking for a job, watching television, and using a computer (Tr. 135). She also cared for her pets (Tr. 136). She prepared meals, did housework and yard work, and shopped (Tr. 137-38). The plaintiff talked on the phone and had friends come over to visit (Tr. 139).

At the hearing held on December 30, 2008, the plaintiff testified that she had significant problems with her memory. She said she could not remember working at McDonald's and could not remember doing any of the other jobs she previously had (Tr. 25). The plaintiff did know that she had lost most of jobs she ever held because she got into fights with others (Tr. 26). The plaintiff reported she had anger problems - when people made her mad, she could black out and not remember what she did (Tr. 26-27). She testified she had no friends and her relationship with her family was poor (Tr. 28).

The plaintiff said she had difficulty sleeping and got only three to four hours of sleep a night (Tr. 29). She usually spent her day in her room or in front of the computer (Tr. 30). She described having periods of time when she stayed up for days and her mind worked fast (Tr. 31). She testified she had gained 60 to 70 pounds in the past two years (Tr. 32). The plaintiff stated that she could not remember anything beyond two years previously and had no memory of her childhood (Tr. 33). She said she left home only once a week to go grocery shopping (Tr. 36). The plaintiff admitted she did not see a psychiatrist (Tr. 37). She only went to the doctor when she needed medication or got sick. The plaintiff reported the medication she took kept her calm (Tr. 38).

Also at the hearing, the ALJ asked Roy Sumpter, Ph.D. a vocational expert, to consider an individual of the plaintiff's age, education, and work experience who could perform unskilled work meaning simple one- to two-step task instructions with limited

contact with the public (Tr. 41).  Dr. Sumpter stated such an individual could perform the light unskilled jobs of cafeteria attendant (401,000 jobs nationally and 4,600 jobs statewide) and housekeeper (900,000 jobs nationally and 16,000 jobs statewide).

## ANALYSIS

The plaintiff alleges disability commencing November 23, 2004, due to ADHD, depression, anxiety, and bipolar disorder.  She was 20 years old on her alleged onset date and was 24 years old on the date of the ALJ's decision.   The plaintiff worked in the past as a server/cashier in a fast food restaurant, but she did not earn enough money for the jobs to rise to the level of past relevant work (Tr. 90-91).  The ALJ found that the plaintiff had the RFC to perform a full range of work at all exertional levels but limited to simple one or two step tasks and no more than occasional public contact.  The ALJ accepted the vocational expert's testimony that an individual of the plaintiff's age, education, and work experience who was limited to simple one- to two-step task instructions with limited contact with the public could perform the light unskilled jobs of cafeteria attendant and housekeeper.  The plaintiff argues that the ALJ's decision is not supported by substantial evidence and the ALJ erred by (1) failing to properly consider her other impairments; (2) failing to properly consider the opinion of treating physician Dr. Browne; and (3) failing to properly consider her subjective complaints of pain.

### *Severe Impairments*

At step two of the sequential evaluation process, the ALJ found that the plaintiff's only severe impairments are bipolar and personality related disorders (Tr. 13). In her brief and reply brief, the *pro se* plaintiff argues that her ADHD, migraines, colitis, and lower back pain are also severe impairments and should have been considered by the ALJ.

13

"'[A]n impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (citations omitted) (emphasis in original); *see* 20 C.F.R. §§ 404.1521, 416.921; *see also* SSR 96-3p, 1996 WL 374181.

The ALJ specifically considered the plaintiff's colitis and ADHD and found they were not severe impairments (Tr. 13). With regard to the colitis, the ALJ noted that the plaintiff was treated successfully and her doctors found her to be asymptomatic after a colonoscopy (Tr. 13). However, it is clear that the plaintiff's issues with irritable bowel syndrome ("IBS") and colitis have been severe and ongoing. On March 31, 2006, Dr. McGill evaluated the plaintiff for bilateral lower abdominal pain, scheduled diagnostic testing, and prescribed medications (Tr. 363-64). On May 2, 2006, Dr. McGill stated the plaintiff's colonoscopy was normal and he thought her pain was from IBS. He instructed the plaintiff to continue her medications and keep a food diary (Tr. 362). In a letter dated May 11, 2006, Dr. McGill stated that he had been treating the plaintiff for lower abdominal pain, which he attributed to IBS. Dr. McGill noted the plaintiff seemed to be improving on medication (Tr. 241). On August 30, 2007, Dr. John M. Rinkliff admitted the plaintiff to the hospital for abdominal pain and bloody diarrhea. A CT scan showed a thickened colon with surrounding edema in her ascending colon consistent with colitis. After starting on medications, the plaintiff improved and stabilized. Dr. Rinkliff discharged the plaintiff on September 2, 2007, with no activity restrictions (Tr. 316). Treatment notes from Dr. McGill dated September 11, 2007, state that the plaintiff was "doing extremely well, tolerating a regular diet," and a prescription for Bentyl, which had been previously prescribed, was refilled (Tr. 361). On November 20, 2007, the plaintiff was asymptomatic and doing well since her hospitalization for colitis (Tr. 356). On January 15, 2008, Dr. McGill scheduled

14

the plaintiff for a followup colonoscopy for her colitis and observed the plaintiff appeared to be asymptomatic (Tr. 355).  The plaintiff states in her brief that she "still h[as] trouble with pain" caused by the colitis (pl. brief 1).

With regard to the plaintiff's ADHD, the ALJ noted that the record "is devoid of evidence of signs or laboratory studies establishing a medically determinable impairment that would interfere with the claimants ability to perform basic work activities" (Tr. 13).  The ALJ further noted that the plaintiff was discharged from therapy in April 2002 without any medications.  The plaintiff sought medication for ADHD in 2004 and provided a past history of treatment.  At that time, Dr. Browne provided the plaintiff with a 30-day prescription for Adderal and Risperdal (Tr. 13).

This court agrees with the plaintiff that her colitis and ADHD should have been considered severe impairments by the ALJ as they appear to be more than slight abnormalities.  However, as to her complaints of back pain and migraine headaches, this court has found no mention of the plaintiff reporting or seeking treatment for either issue from any treating source.[1]  The Commissioner argues:

> [T]o the extent that any of Plaintiff's other impairments should arguably been found severe, the Commissioner submits that the residual functional capacity assessment, as set forth in the hypothetical question to the vocational expert, included all of the limitations supported in the record. Any arguable deficiency in the ALJ"s opinion-writing technique at step two was ultimately harmless in this case, because regardless of whether particular impairments were classified as severe or nonsevere, the record contained no evidence whatsoever of any additional functional limitations beyond those assessed by the ALJ.

---

[1]The only mentions of these issues were in the plaintiff's psychological evaluations.  When Dr. Bodtorf performed a psychological consultative examination of the plaintiff on May 18, 2006, the plaintiff stated that she "has had some difficulties with migraine headaches as well" (Tr. 256-60). When Dr. Salmon performed a consultative psychological examination of the plaintiff on September 5, 2006, in connection with her application for benefits, she stated that she had problems with stiffness in her lower back (Tr. 306-11).

(Def. brief 14). As will be set forth below, this court finds that the ALJ made other errors in the sequential evaluation process, and thus remand is appropriate. Accordingly, upon remand, the ALJ is instructed to consider the plaintiff's colitis, IBS, and ADHD as severe impairments and to consider the combined effect of all the plaintiff's impairments at each step of the sequential evaluation process.

### Treating Physician

In her reply brief (doc. 40), the plaintiff appears to argue that the ALJ did not properly consider the opinion of her treating physician, Dr. Browne. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the Listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p, 1996 WL 374188, requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. *Id.* at *5. As stated in Ruling 96-2p:

16

> [A] finding that a treating source medical opinion is not
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected.  Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in [20 C.F.R. § 416.927].  In many cases,
> a treating source's medical opinion will be entitled to the
> greatest weight and should be adopted, even if it does not meet
> the test for controlling weight.

*Id.* at *4.

On December 22, 2008, Dr. Browne completed a medical source statement form stating that the plaintiff had marked limitations in understanding and remembering short simple instructions, making judgments or simple work or school related decisions, interacting appropriately with supervisors and coworkers, and interacting appropriately with the public.  Dr. Browne further found the plaintiff had extreme limitations in understanding, remembering, and carrying out detailed instructions and responding appropriately to work pressures and work changes (Tr. 393-94).

In her decision, the ALJ stated:  "[D]espite alleging continuing disability, no credible medical statement from a treating source has been submitted to substantiate her claim for benefits.  Dr. Louis Browne, claimant's general practitioner, medicates claimant for bipolar disorder, but his records do not document findings confirming the existence of the disorder" (Tr. 16).  As discussed above, the ALJ found that the plaintiff's bipolar disorder was a severe impairment.  The ALJ did not mention Dr. Browne's December 2008 medical source statement in her decision.

The Commissioner argues that Dr. Browne's December 2008 opinion "is particularly at odds with his own treatment notes and findings and was an indication that his opinion was merely a recitation of the plaintiff's subjective complaints," which the ALJ found to be not credible (def. brief 15-16).  The Commissioner notes that Dr. Browne stated in June 2004 that it was questionable whether the plaintiff had bipolar disorder.  The plaintiff

17

assured Dr. Browne she would be seeking further evaluation with "behavioral health," and he provided her with a 30-day prescription for Risperdal and Adderal at that time (Tr. 200). However, there is no evidence the plaintiff ever pursued any behavioral or mental health treatment (def. brief 15).

The Commissioner's argument is a *post-hoc* rationalization not offered by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). In her decision, the ALJ did not mention Dr. Browne's December 2008 medical source statement nor provide an analysis of the weight, if any, given to the statement. As discussed above, even if the ALJ found that Dr. Browne's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques or was inconsistent with the other substantial evidence in the case record and thus not entitled to "controlling weight," it does not mean that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors described above. Without the ALJ's analysis, it is impossible to determine whether the ALJ's apparent rejection of Dr. Browne's opinion is based upon substantial evidence. Accordingly, upon remand, the ALJ should assess in accordance with the above-cited law Dr. Browne's opinion that the plaintiff had marked limitations in several areas of mental functioning. In the analysis, the ALJ should address the extent to which the opinion and findings of Dr. Salmon, a psychologist who evaluated the plaintiff and concluded she had marked limitations with regard to interacting with the public, supervisors, and co-workers as well as marked limitations in responding appropriately to work pressures or changes in a routine work setting (Tr. 306-13), support Dr. Browne's opinion.[2]

---

[2]Such an analysis is particularly important as the vocational expert testified at the hearing, upon questioning by the plaintiff's attorney, that a person with the limitations described by Dr. Browne and Dr. Salmon would not be able to perform any work (Tr. 42-44).

***Subjective Complaints***

> The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> > [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .
> > It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

> The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> > (1)    the individual's daily activities;

> > (2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

> > (3)    factors that precipitate and aggravate the symptoms;

19

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ concluded with regard to the plaintiff's credibility:

[T]he claimant's statements concerning her impairments and their impact on the ability to work are considerably more limited and restricted than is established by the medical evidence. The alleged limitations are self-imposed restrictions not supported in the medical evidence by clinical signs, symptoms, or laboratory findings.

(Tr. 16). In support of the credibility finding, the ALJ noted that the plaintiff remained able to perform many household chores and attended appointments as required. The ALJ also stated that the plaintiff "did not demonstrate any overt behaviors during the course of the hearing" (Tr. 16). Lastly, the ALJ found that the objective medical evidence demonstrated that the plaintiff did not suffer from disabling symptoms, noting that the plaintiff's symptoms "have been controlled adequately with conservative treatment modalities and have not required inpatient intervention since the alleged onset date" (Tr. 16-17). Based upon the foregoing, this court finds that the ALJ appropriately evaluated the plaintiff's credibility.

20

***Residual Functional Capacity***

The ALJ must assess a claimant's RFC "based on all the relevant medical and other evidence."  20 C.F.R. § 404.1520(a)(4).

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.
> . . .

SSR 96-8p, 1996 WL 374184, at *7.

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling.  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974).  The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  *Id.*  The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed.  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

As described above, this court finds that the ALJ erred in finding that the plaintiff's colitis, IBS, and ADHD were not severe impairments and in evaluating Dr. Browne's opinion of the plaintiff's limitations.  Upon remand, the ALJ is instructed to evaluate the plaintiff's RFC in accordance with the foregoing.

21

***Vocational Expert***

"[I]n order for a [VE]'s opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). Upon remand, should further testimony of a vocational expert become necessary at step five of the sequential evaluation process, the ALJ is instructed to convene a supplemental hearing.

## CONCLUSION

Now, therefore, based upon the foregoing

IT IS ORDERED that the Commissioner's decision is reversed under sentence four of 42 U.S.C. § 405(g), and the case is remanded to the Commissioner for further proceedings as discussed above.

IT IS SO ORDERED.

s/Kevin F. McDonald
United States Magistrate Judge

February 15, 2011

Greenville, South Carolina

22